# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Hill*, 2012 IL App (1st) 102028

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEMETRIUS HILL, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-2028 |
| Filed | May 4, 2012 |
| Rehearing denied | August 14, 2012 |
| Modified on denial of rehearing | August 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction and sentence for unlawful use of a weapon by a felon were reversed and the cause was remanded for further proceedings where defendant was prejudiced by his counsel's failure to file a motion to suppress his postarrest statement that he owned the shotgun found in his girlfriend's apartment pursuant to the execution of a search warrant, especially when there was no reasonable trial strategy or any basis in the record that would excuse filing such a motion. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-19378; the Hon. Marcus R. Salone, Judge, presiding. |
| Judgment | Jurisdiction retained; remanded for suppression hearing. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Deepa Punjabi, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Jon Walters, and Charles J. Prochaska, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE EPSTEIN delivered the judgment of the court, with opinion.

Justices McBride and Howse concurred in the judgment and opinion.

## OPINION

¶ 1     Following a bench trial, defendant Demetrius Hill was convicted of unlawful use of a weapon by a felon and was sentenced to four years in prison. On appeal, defendant raises three issues: (1) whether he was denied his sixth amendment right to effective assistance of counsel based on his trial counsel's failure to move to suppress his postarrest statement that a gun found in an apartment was his; (2) whether the State failed to prove his guilt beyond a reasonable doubt because the State did not show that he had constructive possession of the gun; and (3) whether his conviction for unlawful possession of a weapon by a felon must be vacated because the statute creating the offense violates his second amendment right to bear arms. For the reasons that follow, we remand to the circuit court for further proceedings.

¶ 2                     BACKGROUND

¶ 3     At trial, the court first heard testimony from two witnesses on behalf of the State, Chicago police officers Scott Hall and Ronald Coleman. On September 23, 2009, sometime after 4 p.m., Officer Hall was in the area of Madison and Kostner trying to locate "an identified subject" for a narcotics search warrant. Officer Hall saw a vehicle driving north on Kildare, just past Washington, that matched the description of the subject's vehicle and plates. Officer Hall curbed the vehicle, and the driver identified himself as Demetrius Hill. Officer Hall did not run the vehicle's license plates when the stop occurred and did not ask for any identification from Hill.

¶ 4     After curbing Hill's vehicle, Officer Coleman "placed Mr. Hill in custody." Officer Hall gave Hill his *Miranda* arnings and put him in handcuffs. Officer Hall showed him a copy of a search warrant, which permitted the search of Hill's person and the second-floor apartment at 4310 West Flournoy. Officer Hall then conducted a pat down and retrieved a set of keys; he estimated that there were "[m]ore than two, less than ten." When asked if any of the keys were for the Flournoy address, Hill responded, "yes." Officer Hall then placed Hill in the back of his squad car. In Officer Hall's view, Hill was not free to leave.

-2-

¶ 5        Officer Hall radioed Officer Coleman and explained that he had made contact with Hill and was relocating to 4310 West Flournoy. Officer Coleman and other officers were already at the apartment and had been conducting surveillance since 4:35 p.m. or 4:45 p.m., preparing to execute the search warrant for that location. After Officer Hall arrived, the police used two of the keys recovered from Hill to open the downstairs door and the apartment door on the second floor. The search of the apartment began at around 5:05 p.m.

¶ 6        The officers found no one in the three-bedroom apartment. According to the complaint for the search warrant that Officer Coleman prepared, there was information that ecstasy would be found in the front bedroom. Coleman searched the front bedroom but did not find narcotics there, and he never entered the back bedroom. In the middle bedroom, however, Officer Coleman recovered "underneath the bed, inside a plastic bag, *** a fully loaded shotgun with one spent round" and 11 live rounds. The plastic bag was in a "little small box" and was "concealed." There were also "a clear plastic bag with residue from possible Ecstasy pills, a scale and other paraphernalia" found "in the dresser area of the bedroom." Officer Coleman also found men's clothing in the bedroom. The officers found no proof of residence for Hill at the apartment.

¶ 7        After recovering the shotgun and other items, Hill was transported to the Homan Square police station. Officer Coleman questioned Hill there around 8:45 p.m. or 9 p.m. Before speaking with Hill, Coleman gave him his *Miranda* warnings. Coleman asked about the shotgun, and Hill "said he had the shotgun for about a month; that he kept it for protection." Hill stated that he had been living at the Flournoy apartment with his girlfriend for five months.

¶ 8        Defense counsel first called Kenneth Riley, who owned the building at 4310 West Flournoy and lived on the first floor. Riley rented the second-floor apartment to Theresa Austin, her daughter, and her brother, Cedric. While Riley had seen Hill "a couple of times" in the building, Hill was not on the lease, did not pay rent, and did not have his name on the mailbox. Riley stated that if anyone besides the three known occupants lived in the apartment, he would require additional rent, but he did not check in to see who lived in the apartment every night.

¶ 9        Cedric Austin testified that he lived at the apartment and paid rent to Riley. Cedric stated that he, Theresa, and her daughter all lived in the apartment. Cedric slept in the back bedroom, Theresa slept in the middle bedroom, and her daughter slept in the front bedroom. Cedric's girlfriend also slept there, in Cedric's bedroom, but she did not pay any rent to the landlord. Cedric stated that Hill was Theresa's boyfriend, but he was never present in the apartment without Theresa being there. Hill did not "live there" and was not a "resident," but Hill had spent the night five or six times in the couple of months before his arrest. Hill had a set of keys "for emergencies," but Cedric stated that nothing kept Hill from coming or going from the apartment. Cedric's clothing was scattered all over the residence, including in Theresa's bedroom, because Theresa did Cedric's laundry for him.

¶ 10       In her testimony, Theresa Austin added that she had been dating Hill for about a year. According to Theresa, Hill did not live with her at 4310 West Flournoy, and he only had keys to the residence because he changed the locks for her when she was arguing with Cedric

about paying his share of the rent. She let Hill keep a key as a backup to let Cedric enter the apartment when she was not there. Hill slept there 7 to 10 times in the two to three months before he was arrested. He came over five times a week to take her to work, but Hill would usually wait for Theresa in his car outside.

¶ 11     Hill testified on his own behalf. He testified that he would pick his girlfriend Theresa up and take her to work and would sometimes go into her apartment to help her with bags that she took to and from work. Hill estimated that he had slept at the apartment 5 to 10 times in the months before his arrest, but that he lived at 4921 West Superior, which was the address listed on his driver's license and car registration. While he had keys to the Flournoy apartment, he did not enter the apartment without Theresa's permission, but used the keys to let Cedric or Theresa's daughter in the residence when Theresa was working late. Hill slept in the middle bedroom, but never checked under the bed in that room and did not know there was a gun there. On cross-examination, Hill denied making a statement to Officer Coleman about possessing the gun.

¶ 12     The parties stipulated that defendant was convicted under the alias David Johnson of manufacturing and delivery of a controlled substance on June 19, 1996. At closing arguments, the parties focused on whether the State had proven that Hill had constructive possession of the gun found in the Flournoy apartment. The court interjected during the arguments and questioned whether the police had authority to detain and transport Hill after searching him on the side of the road. The court asked the parties to brief the issue and continued the case. At a subsequent hearing, the court opined that the police had no authority to detain and transport Hill: "There was a search for–a warrant for the search of his person which they can effectuate right there but they didn't do that. They didn't stop there. They then took him to another location and they have no reason nor authority for it." The court found that there was a possibility that defendant's statement to police would have been suppressed, but because no motion to suppress had been made before trial or during trial, that issue was not before the court. Considering all the evidence, including Hill's statement to police, the court found Hill guilty of unlawful use of a weapon by a felon under section 24-1.1 of the Criminal Code of 1961 (720 ILCS 5/24-1.1 (West 2008)) and sentenced him to four years in prison. This appeal followed.

¶ 13                                ANALYSIS

¶ 14     We first address defendant's claim that he received ineffective assistance of counsel because his trial counsel failed to file a motion to suppress his statement to police. The right to counsel guaranteed by both the United States and Illinois Constitutions includes the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Our supreme court has adopted the two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984), to determine if a defendant was denied effective assistance of counsel. See *People v. Manning*, 227 Ill. 2d 403, 412 (2008). To prevail on such a claim, a defendant must show both that his counsel's representation was deficient and this deficiency prejudiced the defendant. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). "The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *Id.* In

this particular case, we address the prejudice prong first.

¶ 15                                                    Prejudice

¶ 16         " 'In order to establish prejudice resulting from failure to file a motion to suppress, a defendant must show a reasonable probability that: (1) the motion would have been granted, and (2) the outcome of the trial would have been different had the evidence been suppressed.' " *People v. Bew*, 228 Ill. 2d 122, 128-29 (2008) (quoting *People v. Patterson*, 217 Ill. 2d 407, 438 (2005)). Defendant contends that the motion to suppress bore a reasonable probability of success because the police lacked any basis for detaining and transporting defendant to the Flournoy apartment. While defendant does not challenge the search warrant or Officer Hall's actions in stopping defendant's car and searching him, defendant argues that the continued detention violated his fourth amendment rights and as a result his statements at the police station must be suppressed as the product of an illegal seizure.

¶ 17         The fourth amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "The central inquiry under the fourth amendment is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " (Internal quotation marks omitted.) *People v. Conner*, 358 Ill. App. 3d 945, 949 (2005) (quoting *Michigan v. Summers*, 452 U.S. 692, 700 n.11 (1981)). There is no dispute that defendant's detention and transportation after the search constituted a "seizure" within the meaning of the fourth amendment. See *People v. Perkins*, 338 Ill. App. 3d 662, 666 (2003) ("A seizure occurs when the police, by means of physical force or show of authority, have in some way restrained the person's liberty."). After Officer Hall stopped and searched defendant, Officer Hall explained that defendant was not free to leave: defendant was handcuffed, placed in the back of the police car, and transported to the Flournoy apartment. The question, then, is whether the continued detention and transportation of defendant were reasonable. The State offers three reasons why the seizure was reasonable, which we address in turn.

¶ 18         The State first argues that the seizure of defendant was justified because it was supported by probable cause. Even without a warrant, police can seize or arrest a person if police have probable cause. See *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 45 ("Generally, a seizure must be supported by probable cause."); *People v. Jackson*, 232 Ill. 2d 246, 274-75 (2009) ("An arrest executed without a warrant is valid only if supported by probable cause."). "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." (Internal quotation marks omitted.) *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009) (quoting *Jackson*, 232 Ill. 2d at 275). "In other words, the existence of probable cause depends upon the totality of the circumstances at the time of the arrest." (Internal quotation marks omitted.) *Id.*

¶ 19         The State argues that because the police found keys on defendant's person, they could infer that he was in possession of narcotics because police had reason to believe they would

-5-

find narcotics in the Flournoy apartment. We agree that based on the search warrant, the officers had some reason to believe that defendant possessed ecstasy on his person and that they would find ecstacy in the Flournoy apartment. See *People v. Donath*, 357 Ill. App. 3d 57, 63-64 (2005) ("Whether probable cause exists to support a search warrant depends upon whether the totality of the circumstances and facts known to the affiant were sufficient to warrant a person of reasonable caution to believe that the law was violated and that evidence of the violation would be on the premises to be searched."). Officer Hall did not find any ecstacy or contraband on defendant's person, however; he only found a set of keys, which included two keys to the Fluornoy apartment. The State nevertheless claims that, after finding the keys alone, "it was entirely reasonable for [the police] to infer that defendant was committing the felony offense of possession of a controlled substance." While the keys certainly indicated that defendant had access to the Flournoy apartment, the police had not yet searched the apartment and did not know if they would find ecstasy or any other contraband there. Thus, the police did not actually know there were narcotics in the resident at the time they found the keys. The fruits of the search of defendant's person did not give police a reason to believe that defendant had committed the offense of possession of a controlled substance.

¶ 20    The State next argues that the seizure was justified under the principles announced in *Terry v. Ohio*, 392 U.S. 1 (1968). *Terry* ecognized a limited exception to the probable cause requirement, allowing police officers, under appropriate circumstances, to briefly stop a person for temporary questioning where the officer reasonably believes that the person has committed or is about to commit a crime. 392 U.S. at 22. The State relies on a single case, *People v. Maxey*, 2011 IL App (1st) 100011, which the State contends demonstrates that the police properly detained and transported defendant to the Flournoy apartment.

¶ 21    In *Maxey*, police stopped the defendant's car based on descriptions of the vehicle provided by witnesses of a recent attempted robbery of a store. 2011 IL App (1st) 100011, ¶ 47. The defendant also matched the physical description provided by the witnesses, and police transported the defendant to a showup, where the witnesses identified the defendant as the man who attempted to rob them. *Id.* ¶ 66-67. We find the State's reliance on *Maxey* unpersuasive. The court in *Maxey* oncluded that information from several eyewitnesses gave police a reasonable belief that the defendant had just committed a nearby attempted robbery, and where the defendant denied involvement, the police were reasonable in transporting him for identification purposes. *Id.* ¶ 59-67. By contrast, here the State offers no facts to satisfy the "reasonable suspicion" requirement for the detention that followed the search of defendant's person. According to the State, "the police had more than reasonable suspicion; they had probable cause in the form of search warrants for defendant's person and his apartment." This argument conflates the justification for the initial stop pursuant to the search warrant with the justification for defendant's continued detention and transportation. As noted above, defendant does not challenge the officer's authority to stop him based on the search warrant; thus, whether there was reasonable suspicion for the initial stop is irrelevant. Where the search revealed no contraband, the question is on what basis police could continue to detain defendant and transport him to the apartment. In *Maxey*, the brief detention and transportation of the defendant were necessary to confirm or dispel ongoing

-6-

suspicion of a recent attempted robbery. *Id.* There was a specific need to transport the defendant for an immediate showup to determine whether police should continue or end the search for the "fleeing culprit." (Internal quotation marks omitted.) *Id.* ¶ 66-67. There was no such need in the instant case. Here, the results of the search–keys, not drugs–did not fuel further suspicion that defendant had committed or was about to commit a crime, and there was no justification under *Terry* for defendant's continued detention and transportation to the Flournoy apartment.

¶ 22    We note that the finding of probable cause to support the search warrant does not permit us to assume that there was probable cause or reasonable suspicion to justify the continued detention and transportation of defendant. These are related, but different, inquiries, and "[e]ach requires a showing of probabilities as to somewhat different facts and circumstances." 2 Wayne R. LaFave, Search and Seizure § 3.1(b), at 8-9 (4th ed. 2004). "In the case of arrest, the conclusion concerns the guilt of the arrestee, whereas in the case of search warrants, the conclusions go to the connection of the items sought with crime and to their present location." *Id.* at 10. The same holds true for the State's *Terry* argument: the search warrant does not, by its mere existence, give rise to reasonable suspicion that justifies the continued detention and transportation of defendant. While this information supporting the search warrant is now part of the record,[1] the State has never argued–in the motion to supplement the record, in its brief, or at oral argument–that the *specific facts* n the complaint for the search warrant support an independent finding of probable cause or reasonable suspicion that would justify the seizure. Instead, the State simply argues that because police had a reason to believe there were drugs in the Flournoy apartment (*i.e.*, they had probable cause for the search warrant), they also had probable cause, or at least reasonable suspicion, that allowed for defendant's continued detention and transportation. Where the search of defendant revealed no narcotics and police had not yet found any narcotics or contraband at the apartment, the mere expectation that police would find drugs in the apartment, without more, cannot justify defendant's continued detention and transportation to the apartment.

¶ 23    The State next argues that the detention of defendant was a valid seizure incident to the execution of the search warrant under the principles announced in *Michigan v. Summers*, 452 U.S. 692 (1981). In *Summers*, police officers were about to execute a warrant to search a house for narcotics when they encountered the defendant descending the front steps. 452 U.S. at 693. The officers found narcotics in the house, learned that the defendant owned the house, and then arrested him. *Id.* Although the Court found that the initial detention of the defendant constituted a "seizure" and assumed that it was not supported by probable cause (*id.* at 696),

---

[1]The information supporting the search warrant was originally not part of the record, but following oral arguments in this case, the State filed a motion to make the complaint for search warrant part of the record. Defendant filed no opposition, and we granted the motion. According to the complaint for search warrant, an unidentified individual purchased ecstacy from defendant, once just outside the Flournoy apartment and once inside the apartment, and the individual saw defendant go into the front bedroom to retrieve drugs. While the State, on appeal, has not argued that the information supporting the search warrant justified the defendant's detention, this information may be relevant to a motion to suppress filed on remand.

the Court noted that some seizures "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity" (*id.* at 699). In the case before it, the "incremental intrusion" caused by detention was slight compared with "the inconvenience [and] the indignity associated with a compelled visit to the police station." *Id.* at 702-03. The Court then identified three law enforcement interests that justified the incremental intrusion: (1) preventing flight in the event that incriminating evidence is found; (2) minimizing the risk of harm to the officers; and (3) facilitating the orderly completion of the search. *Id.* Ultimately, the Court announced a categorical rule allowing for seizure of a person even when the police do not have probable cause: "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 711.[2]

¶ 24    Since the Supreme Court's decision in *Summers*, several courts have held that the authority to detain an occupant during the execution of a search warrant for the premises also extends to the detention and transportation of an occupant who leaves the premises immediately before the execution of the search warrant and is detained as soon as practicable after leaving. These courts have "decline[d] to delineate a geographic boundary at which the *Summers* holding becomes inapplicable" and instead "consider whether the police detained the individual 'as soon as practicable' after observing him leave the residence." *United States v. Montieth*, 662 F.3d 660, 666 (4th Cir. 2011) (quoting *United States v. Bailey*, 652 F.3d 197, 206 (2d Cir. 2011) (finding that detention is justified where the police "identify an individual *in the process of leaving* the premises subject to search and detain him *as soon as practicable* during the execution of the search" (emphasis in original))); *United States v. Bullock*, 632 F.3d 1004, 1020 (7th Cir. 2011) (finding detention justified under *Summers*

---

[2]We note that on appeal, defendant has referred to his roadside detention following the search as an "arrest" because Officer Hall handcuffed him, placed him in a squad car, and transported him to the apartment. In deciding whether a detention exceeds the bounds of a limited detention under *Summers* or an investigatory stop under *Terry*, courts must determine whether the degree of the intrusion was reasonable in relation to the facts known at the time. See, *e.g.*, *People v. Conner*, 358 Ill. App. 3d 945, 949 (2005) (concluding that use of handcuffs during *Summers* detention was reasonable under the circumstances); *United States v. Bullock*, 632 F.3d 1004, 1021 (7th Cir. 2011) (finding that under *Summers*, "roadside detention followed by handcuffs and placement in a squad car certainly carries more stigma than a detention in one's home, [but] the facts in this case warranted the additional intrusions for the limited time to execute the search warrant"); *People v. Johnson*, 408 Ill. App. 3d 107, 119 (2010) (concluding that police officer's actions in handcuffing defendant constituted an arrest, rather than a *Terry* stop, where such use of force was not reasonable based on the facts surrounding the stop); *People v. Maxey*, 2011 IL App (1st) 100011, ¶¶ 59-68 (finding that continued detention and transportation of defendant for identification purposes did not transform *Terry* stop into an illegal seizure or arrest, where the decision to transport defendant was "reasonable" and sufficiently limited). In light of our resolution of this appeal, we do not reach the question of whether the intrusiveness of the detention was reasonable under the circumstances.

where officer who observed defendant leave the premises "had to radio uniformed officers to make the stop" and there was "nothing to suggest that the vehicle was not pulled over as soon as practicable"); *United States v. Cavazos*, 288 F.3d 706, 712 (5th Cir. 2002); *United States v. Cochran*, 939 F.2d 337 (6th Cir. 1991); accord *Williamson v. State*, 921 A.2d 221, 234 (Md. 2007) ("Because the police, to promote officer safety, detained [defendant] immediately after he left the house, before he entered his car and drove away, police were justified in detaining him and bringing him back into the house during the search."); *Rochon v. State*, 2008 OK CR 1, 176 P.3d 362; *State v. Madsen*, 2000-NMCA-050, 5 P.3d 573.

¶ 25 Some courts have rejected the expansion of *Summers* to cover occupants who had just left the premises and are seized some distance away from the premises. See, *e.g.*, *United States v. Sherrill*, 27 F.3d 344, 346 (8th Cir. 1994) (*Summers* did not authorize stopping the defendant one block from his home, as "intrusiveness of the officers' stop and detention on the street was much greater" than in-home detention, and "officers had no interest in preventing flight or minimizing the search's risks because [defendant] had left the area of the search and was unaware of the warrant"); *United States v. Edwards*, 103 F.3d 90, 94 (10th Cir. 1996) (*Summers* did not justify 45-minute detention of defendant, who left premises before warrant execution began and was stopped three blocks away, as defendant's "streetside detention played no part in facilitating the orderly completion of a search being conducted three blocks away," and defendant "had no reason to flee" because he "did not know–prior to being stopped–that any warrant *was* being executed" (emphasis in original)); *United States v. Reinholz*, 245 F.3d 765, 778 (8th Cir. 2001) ("*Summers* does not apply to this case, however, because Reinholz was not on the premises being searched when he was detained," but instead "was at work, at least a twenty-five minute drive from his residence"); *Commonwealth v. Charros*, 824 N.E.2d 809, 816 (Mass. 2005) (finding that *Summers* did not allow police to stop the defendant a mile away from his residence and then bring him there for search warrant execution because such seizures "produce[ ] all the indignity of an arrest in full view of the public"); *Parks v. Commonwealth*, 192 S.W.3d 318 (Ky. 2006).

¶ 26 The parties have cited no Illinois decision that addresses the expansion of *Summers* to occupants of premises who have just left and are detained as soon as practicable. In this particular case, we need not decide the issue. Although the State struggles to fit the facts of this case into the "recent occupant" mold, the State's description of events is wholly speculative in view of the record on appeal. The State argues that because Officer Hall found defendant one mile from the Flournoy apartment within the same "narrow time frame" that Officer Coleman conducted surveillance there, Officer Coleman must have seen defendant leave the apartment and radioed Officer Hall the direction in which defendant was heading. In the record before us, however, there is no affirmative evidence that Officer Coleman or any other officer observed the defendant come or go from the Flournoy address just before defendant's roadside detention. We question whether Officer Hall and Officer Coleman would have left such a basic fact out of their description of the day's events.

¶ 27 Setting that question aside, neither the "narrow time frame" nor defendant's proximity to the Flournoy apartment provides anything close to definitive evidence that Officer Coleman observed defendant leave the apartment. As to the sequence of events, it is unclear whether Officer Coleman even began his surveillance before Officer Hall curbed defendant's

vehicle: Officer Hall encountered defendant "sometime after 4:00 p.m.," and Officer Coleman's surveillance began around 4:35 p.m. or 4:45 p.m. As for defendant's location, Officer Hall indicated that his "task was to circle the area around Madison and Kostner and try to locate" defendant. Officer Hall found him just two blocks from Madison and Kostner–a full 10 blocks away from the Flournoy apartment. At best, the record fails to contradict the State's version of events. There is simply no indication that Officer Coleman or any other officer observed defendant leave the Flournoy apartment just before Officer Hall encountered him on the street.

¶ 28    Apart from its factual arguments, the State has not asked us to expand *Summers* to cover a situation where there is no evidence that defendant had recently left the premises and was stopped some distance away. While neither party has cited a case where *Summers* has been applied to facts similar to those here, those courts that have extended the doctrine to recent occupants have sounded a "note of caution" about further expansion of the *Summers* rule:

> "*Summers* is not a license for law enforcement to detain 'occupants' of premises subject to a search warrant anywhere they may be found incident to that search. Instead, we hold today that *Summers* authorizes law enforcement to detain the occupant of premises subject to a valid search warrant when that person is seen leaving those premises and the detention is effected *as soon as reasonably practicable*." (Emphasis in original.) *United States v. Bailey*, 652 F.3d 197, 208 (2d Cir. 2011).

We therefore hold that on the record before us, *Summers* did not allow the police to detain and transport defendant incident to the execution of the search warrant, where there was no indication that the police detained him as soon as practicable after observing him leave the residence. Again, our sole inquiry is whether the motion to suppress evidence bore a reasonable probability of success. For the purposes of this appeal, we need not, and do not, endorse those decisions that have extended *Summers* to allow for detention of occupants who have recently left their residence and are detained as soon as practicable somewhere outside the residence.

¶ 29    Finally, the State argues that even if defendant's detention and transportation constitute an illegal seizure, his statements to police were sufficiently attenuated from the detention such that the suppression of his statements is unwarranted. "[T]he relevant inquiry is whether the statements were obtained by exploitation of the allegedly illegal arrest or by means sufficiently distinguishable to be purged of the primary taint" of illegality. (Internal quotation marks omitted.) *People v. Johnson*, 237 Ill. 2d 81, 93 (2010) (quoting *People v. Morris*, 209 Ill. 2d 137, 157 (2004)). Factors to be considered in determining whether a statement is the product of an illegal arrest include: (1) the proximity in time between the arrest and the statement; (2) the presence of intervening circumstances; (3) the flagrancy of the police misconduct; and (4) whether *Miranda* warnings were given before the statements were made. *Id.*

¶ 30    Focusing on the second factor, the State contends that the recovery of the shotgun in the apartment created independent, intervening probable cause for defendant's arrest. While the discovery of the gun at least raises the possibility of intervening probable cause, we agree with defendant that the attenuation inquiry is premature based on the limited question

presented in the appeal. The attenuation question might not even arise if the trial court determines that the motion to suppress should not be granted in light of new facts developed at a suppression hearing on remand. If the circuit court does eventually reach the attenuation question, the facts surrounding the probable cause inquiry should be developed at a hearing.

¶ 31    The State assumes, without discussion, that the discovery of the gun automatically warrants a finding of probable cause to arrest. The State draws analogy to *People v. Johnson*, where our supreme court found that there was intervening probable cause to arrest the defendant based on the discovery of a gun under the passenger seat of a car. 237 Ill. 2d at 94. In that case, however, the discovery of the gun gave rise to probable cause because the police were investigating a nearby shooting and observed defendant and the driver, who appeared nervous, exit the car where the gun was found. *Id.* at 84-86. This case, by contrast, involves a fact-intensive inquiry related to constructive possession of a weapon found hidden underneath a bed in a three-bedroom apartment. The complaint for search warrant states that 4310 Flournoy was defendant's residence, without explanation, and that an unidentified person told police that he or she saw defendant go in the front bedroom of the apartment to retrieve drugs to sell. Beyond this, there is no indication about what police knew about defendant's connection to the apartment. More specifically, there are no facts on record that indicate how police connected defendant to the gun found hidden under the bed of the middle bedroom in the three-bedroom apartment. Both parties should have the opportunity to develop these facts on remand, assuming that the circuit court even finds it necessary to address the attenuation issue.

¶ 32    The last step in our prejudice inquiry is to determine if there is a reasonable probability that the outcome of the trial would have been different had defendant's statements been suppressed. See *People v. Bew*, 228 Ill. 2d 122, 127 (2008). The central question for the trial court was whether defendant had constructive possession of the gun found hidden under the bed in the middle bedroom of 4310 West Flournoy. To establish constructive possession, the State must prove that defendant had knowledge of the presence of the weapon and defendant had immediate and exclusive control over the area where the weapon was found. See *People v. Grant*, 339 Ill. App. 3d 792, 798 (2003). Apart from defendant's statement, several defense witnesses testified that while defendant had access to the Flournoy apartment and sometimes slept there in his girlfriend's bedroom, he did not pay rent or receive mail there and lived at another residence. Defendant testified that he only entered the residence with his girlfriend's permission and did not know about the gun hidden underneath the bed. The crucial piece of evidence that established defendant's knowledge and control was his statement that he "lived" at the Flournoy apartment and that he brought the gun into the apartment. The trial court stated as much in its ruling, finding that "what is most damning is the [d]efendant's alleged statement where he says, 'It's mine.' " We conclude that had defendant's statements been suppressed, there is a reasonable probability that the outcome of the trial would have been different.

¶ 33                        Deficient Representation

¶ 34    Defendant argues that there is no reasonable basis why his counsel did not file a motion

-11-

to suppress, and his trial counsel's performance was therefore deficient under constitutional standards. To establish deficient representation, defendant must prove that counsel's performance, as judged by an objective standard of competence under prevailing professional norms, was so deficient that counsel was not functioning as the "counsel" guaranteed by the sixth amendment. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). In other words, defendant must establish that his lawyer's performance fell below an objective standard of reasonableness. *People v. Steels*, 277 Ill. App. 3d 123, 127 (1995). "[T]he decision whether to file a motion to suppress is generally 'a matter of trial strategy, which is entitled to great deference.' " *People v. Bew*, 228 Ill. 2d 122, 127 (2008) (quoting *People v. White*, 221 Ill. 2d 1, 21 (2006)). Defendant must overcome the presumption that the decision not to file the motion was "the product of sound trial strategy." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327 (2011).

¶ 35    Defendant has overcome the presumption in this case. We see no reasonable trial strategy in trial counsel's decision not to file a motion to suppress defendant's statement to the police. As explained in detail above, a successful motion to suppress would have removed the most damaging evidence connecting defendant to the gun. The motion would have been defendant's best chance at success, and there is no indication that such a motion would have harmed defendant's case. See *People v. Little*, 322 Ill. App. 3d 607, 613 (2001) ("A motion to quash and suppress would have been defense counsel's strongest, and most likely wisest, course of action. The fact counsel had other defense options available to him does not excuse counsel's failure not to file a pretrial suppression motion.").

¶ 36    Apart from trial strategy, there is no basis in the record to excuse trial counsel's failure to file the motion. When the trial court raised the issue after both parties had rested, trial counsel argued that the police reports and other pretrial discovery stated that defendant was "detained" at the vehicle stop, but that he was arrested later, after the gun was found, at 4310 West Flournoy. Trial counsel claimed that, as a consequence, he could not have known that a basis for the motion existed until the trial had commenced. We do not agree. First, even if the defendant was not "arrested," he was unquestionably seized within the meaning of the fourth amendment when he was handcuffed, placed in the squad car, and transported to the apartment. The police must have some justification for that seizure, just as they must for an arrest. Second, the fact of when an arrest occurs is a legal conclusion, determined by the trier of fact based on the totality of the circumstances. See *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009). The timing or existence of an arrest does not depend on whether an officer uses the word "arrest" in a police report or in testimony. See *Brendlin v. California*, 551 U.S. 249, 260 (2007); *cf. People v. Johnson*, 408 Ill. App. 3d 107, 119 (2010) ("[P]robable cause is an objective standard, and a police officer's subjective belief regarding its existence is not determinative."). Finally, even if it was Officer Hall's testimony that made defense counsel aware of the possibility of filing a motion, defense counsel admitted that he never made a motion before both sides rested. The trial court is authorized to hold a joint suppression hearing and a bench trial (*People v. Givens*, 237 Ill. 2d 311, 332 (2010)), and a defendant may make a motion to suppress once trial has already started if he was not previously aware of the grounds of the motion. See 725 ILCS 5/114-11(g), 114-12(c) (West 2008); *People v. Hoffman*, 84 Ill. 2d 480, 485 (1981); *People v. Flatt*, 82 Ill. 2d 250, 262-63 (1980).

¶ 37    Based on the foregoing, we conclude that defendant's trial counsel's failure to file a motion to suppress defendant's statement to police constitutes deficient performance under constitutional standards, and this deficient performance prejudiced the defendant. Defendant was deprived of the effective assistance of counsel at trial.

¶ 38                                    Sufficiency of the Evidence

¶ 39    To quell any double jeopardy concerns, we finally address defendant's argument that the State failed to prove his guilt beyond a reasonable doubt. See *People v. Little*, 322 Ill. App. 3d 607, 613 (2001). "The double jeopardy clause forbids a second, or successive, trial for the purpose of affording the prosecution another opportunity to supply evidence it failed to muster in the first proceeding." *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). While the ineffective assistance of counsel requires us to remand to the circuit court for further proceedings, if defendant is correct that the evidence was insufficient for a conviction, "the only proper remedy is a judgment of acquittal." *Id.* If, on the other hand, "the totality of the evidence presented at defendant's first trial was sufficient for a rational trier of fact to find that the essential elements of the crime had been proven beyond a reasonable doubt, no double jeopardy violation is created on retrial." *People v. Ward*, 2011 IL 108690, ¶ 50 (citing *People v. McKown*, 236 Ill. 2d 278, 312 (2010)).

¶ 40    On a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). To sustain a conviction for unlawful possession of a weapon by a felon, the State must prove defendant has a prior felony conviction and defendant had knowing possession of a prohibited weapon. 720 ILCS 5/24-1.1 (West 2008); *People v. Hampton*, 358 Ill. App. 3d 1029, 1031 (2005). Possession may be actual or constructive. *People v. Grant*, 339 Ill. App. 3d 792, 798 (2003). Constructive possession is shown where defendant had knowledge of the presence of the weapon and defendant had immediate and exclusive control over the area where the weapon was found. *Id.* "Where [contraband is] found on premises under defendant's control, it may be inferred that he had the requisite knowledge and possession, absent other facts and circumstances which might leave a reasonable doubt as to guilt in the minds of the jury." *People v. Freiberg*, 147 Ill. 2d 326, 361 (1992). The mere fact that others had access to the premises does not defeat constructive possession because the law recognizes the possibility of joint possession. *People v. Hill*, 226 Ill. App. 3d 670, 672-73 (1992).

¶ 41    Defendant argues that the evidence was insufficient to find that defendant constructively possessed the weapon, even though Officer Coleman testified that defendant admitted that the gun was his, he brought it into the apartment, and he had been living at the apartment with his girlfriend for five months. At trial, defendant denied making this statement to Officer Coleman, and he now claims that Officer Coleman's testimony is incredible. It is the responsibility of the fact finder to resolve conflicting testimony, assess the credibility of witnesses, and determine the weight to be given to their testimony. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). The fact finder's acceptance of testimony is entitled to great deference.

*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Here, the trial judge acknowledged that he was making a credibility determination, and he credited the police officer's testimony over the defendant's testimony. We do not view the officer's testimony as so flawed or improbable that it was "impossible for any fact finder reasonably to accept *** it." *Id.* at 283. Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found that defendant had constructive possession of the gun. See, *e.g.*, *People v. Chicos*, 205 Ill. App. 3d 928, 935 (1990) (evidence was sufficient for constructive possession where defendant possessed a key to the apartment and confessed that she lived in the apartment and the contraband was hers); *People v. Brown*, 327 Ill. App. 3d 816 (2002) (evidence was sufficient to find constructive possession where defendant admitted bringing the gun into his girlfriend's apartment and testimony established that defendant had been staying there around the time the weapon was found).

¶ 42                              Second Amendment Challenge

¶ 43    In light of our decision to remand for a suppression hearing, we do not address defendant's claim that the unlawful use of a weapon by a felon statute violates defendant's second amendment rights. See *People v. Carpenter*, 228 Ill. 2d 250, 264 (2008) ("[A] court of review should consider the constitutionality of a statute as a matter of last resort, only after the resolution of any other nonconstitutional and constitutional grounds for disposing of the case.").

¶ 44                                    CONCLUSION

¶ 45    We have limited our review of defendant's ineffective assistance claim to the record before us, and we have determined that a motion to suppress had a reasonable probability of success. As this court has recognized, at this stage "[i]t is not our desire or purpose to decide a motion to suppress that never was presented, argued, or ruled on in the trial court." *People v. Steels*, 277 Ill. App. 3d 123, 128 (1995). Our supreme court has directed that the proper resolution in this situation is to retain jurisdiction and remand to the circuit court for a suppression hearing. See *People v. Cokley*, 211 Ill. 2d 589 (2004) (supervisory order) (directing this procedure and vacating the judgment of the appellate court that had reversed and remanded for a new trial); *People v. Davis*, 211 Ill. 2d 590 (2004) (supervisory order); *People v. Malek*, 225 Ill. 2d 657 (2007) (supervisory order). If the outcome of the suppression hearing requires, a new trial should be held; otherwise, the case should return to the appellate court for consideration of the remaining issues. See *Cokley*, 211 Ill. 2d 589.

¶ 46    Jurisdiction retained; remanded for suppression hearing.