In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 20-2377

ROBERT A. TAYLOR,

*Plaintiff-Appellant,*

*v.*

RICKY A. HUGHES, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-04597 — **Manish S. Shah**, *Judge.*

_____

ARGUED NOVEMBER 1, 2021 — DECIDED FEBRUARY 16, 2022

_____

Before HAMILTON, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Police officers owe judges candor
when seeking search warrants. This case presents a troubling
example of an officer violating that duty. Acting on the tip of a
John Doe informant, Chicago police officer Ricky Hughes se-
cured a warrant to search Robert Taylor's apartment for a gun.
The informant knew where Taylor lived, but not his address.
And Hughes did not take steps to learn it. He instead took a
guess, and that guess was wrong. A months-long ordeal

followed, which included Taylor spending 128 days in jail. He eventually sued Hughes and other CPD officers for violating his constitutional rights. The district court granted summary judgment for all defendants, but we see some aspects of this case differently, especially those relating to Officer Hughes's misconduct in obtaining the search warrant. So we affirm parts of the district court's ruling and reverse others.

## I

## A

In June 2011, the Chicago Police Department was wrapping up an investigation—codename Uptown Girl—into drug activity on the city's north side. Detective Joshua Weitzman led the investigation. Officer Ricky Hughes was on the narcotics team assisting with the case. On June 21, Weitzman told Hughes that he had learned from a John Doe informant that Robert Taylor, an alleged member of a north-side drug gang, had a gun in an apartment on the south side.

Later that same day, Officer Hughes met with John Doe at the precinct. At the time of the meeting, Hughes says he knew Doe's real name and reviewed his criminal record. But today, so far as the record reveals, John Doe is a complete unknown: no one knows John Doe's real name, how to contact him, or, for that matter, why he came forward with information concerning Robert Taylor during the Uptown Girl investigation. Nor is there paperwork to help, as Hughes shredded any notes he took while meeting with Doe.

As Officer Hughes remembers things, John Doe told him that two days earlier, on June 19, he was visiting Taylor's apartment when Taylor showed him a black .38 revolver. Hughes found Doe's account credible. Doe told Hughes that

he did not know Taylor's address, but he did know how to get there. So the two drove down to the south side, and Doe directed Hughes to an apartment building. The building Doe identified was 643–645 W. 62nd Street, an L-shaped apartment complex on the south side of the street. The numbers "643–45" appeared under a window on the building's street-facing side. Doe told Officer Hughes that the unit immediately above those numbers was Taylor's.

The building itself has two entrances along its right-hand side (one to 643 and one to 645), and according to Doe, Taylor's unit could be accessed through the door closest to the street. Doe also told Hughes how to get to Taylor's unit once inside the building—up the stairs one flight, then down the hall to the first door on the left.

B

Armed with this information, Officer Hughes prepared an application requesting permission to search Taylor's apartment. Hughes's accompanying affidavit identified Taylor's apartment as "645 W. 62nd Street #1S." When asked how he determined this was Taylor's address, Hughes testified: "I decided that it was 645 1S." But *how* he decided he could not explain. Hughes also testified that he used building number 645 (rather than 643) because the window Doe pointed out was closer to the "45" on the front of the building. And as for the unit number, Hughes testified that the "S" might have stood for "South," or "Side," or perhaps just the letter "S" in an alphabetical list—he was unable to say for sure. Nor did Hughes take any step to corroborate Taylor's address. Hughes testified that he "didn't have no time" to do so. In the end, then, Hughes took a guess, listing the address as 645 W. 62nd Street #1S in the search warrant application.

The application stated that Robert Taylor had showed John Doe a black .38 revolver inside apartment #1S at 645 W. 62nd Street, that John Doe had seen the gun before, and that Robert Taylor was a felon. The proposed warrant, in turn, sought permission to search "645 W. 62nd Street #1S, a multi-unit building," and to seize evidence of the offense of Unlawful Use of Weapon under Illinois law, 720 ILCS 5/24-1, specifically:

> Unlawful use of weapon and any documents showing residency, any paraphernalia used in the weighing, cutting or mixing of illegal drugs. Any money, any records detailing illegal drug transactions.

The warrant's references to illegal drugs were not based on anything Doe told Officer Hughes. Instead, Hughes later acknowledged that the drug reference was stock language he left in place because "[u]sing drugs and guns go hand [in] hand."

Officer Hughes presented the warrant application to a Cook County Judge on the evening of June 21. Because the meeting took place after business hours, Hughes arranged for the judge to meet him inside his covert vehicle in a predetermined location. From what we can tell Officer Hughes took with him the warrant paperwork, a copy of John Doe's criminal history, and Doe himself. Officer Hughes later testified that he did not give the judge any explanation for the warrant's reference to drug paraphernalia, did not tell the judge that he did not know if the address listed on the warrant was accurate, and did not explain that Doe had provided directions that the officers could follow to Taylor's apartment. The judge found Officer Hughes's showing sufficient and signed

the warrant, authorizing a search of apartment #1S at 645 W. 62nd Street.

C

Early the next morning, Officer Hughes met with the search team and told his colleagues to "follow [him]" to the target apartment. Hughes intended to use the directions John Doe had given him to lead the team to Taylor's unit. And that is what happened. At around 6:00 a.m. on June 22, 2011, Hughes used a battering ram to break down the door of the apartment Doe identified. The apartment the officers entered *was* in fact Robert Taylor's apartment. But it was *not* the apartment listed on the warrant: it was not #1S at 645 W. 62nd Street, but instead was #1N at 643 W. 62nd Street.

The police did not find Robert Taylor there. But in one of the unit's two bedrooms they did find proof that they were indeed inside Taylor's apartment—an employee ID and mail addressed in his name. It was from this mail that the officers learned the actual address of Taylor's unit. This first bedroom contained little else of note, however.

The second bedroom was a different story. There the officers found two adults—a man named Mario Barnes and a woman, Barbara Taylor, who would turn out to be Robert Taylor's niece—and three kids. Also inside this room was an open safe with a loaded blue steel semiautomatic pistol—a different gun than the black .38 described by John Doe. Officer Hughes testified that Barnes insisted "it wasn't his gun," but could not recall if Barnes said that it was Taylor's. But Barnes reportedly did tell Hughes that Taylor was known to carry guns.

The officers found no evidence directly connecting Robert Taylor to this second bedroom. According to Officer Hughes, however, Barnes's statement, along with the fact that "the reason why I was there [was] for a search warrant for a gun," allowed him to determine that the blue gun found inside the open safe belonged to Taylor.

D

Based on this determination, Officer Hughes requested what CPD calls an investigative alert for Taylor's arrest on probable cause that he was a felon in possession of a firearm. CPD's Investigative Alert Application System, memorialized in CPD Special Order S04-16, is like a more permanent police bulletin, allowing officers to create two types of alerts: "Probable Cause to Arrest" and "No Probable Cause to Arrest." As its name suggests, an alert with probable cause authorizes any officer who encounters that individual to make an arrest. Investigative alerts do not expire within the system. Police policy instead instructs officers to regularly check and update the database "to ensure investigative alert requests on file are canceled when the subject of the alert has been apprehended or the investigative alert is no longer needed."

Detective Weitzman processed Officer Hughes's alert request. As Weitzman later explained, Robert Taylor was "a convicted felon, he was named in a search warrant, and they recovered a gun," and that added to probable cause. So he issued the alert.

After learning of the search, Taylor turned himself in at the police station on June 28. After police took Taylor into custody, Officer Hughes prepared a criminal complaint charging

him with unlawful possession of the blue gun recovered from his apartment, in violation of 720 ILCS 5/24-1.

Taylor then spent over four months in the Cook County Jail awaiting trial. No trial ever ensued, though. In November 2011, the Circuit Court of Cook County found the search warrant invalid based on the address error, quashed his arrest, suppressed evidence of the weapon, and expressly acquitted Taylor of the gun charge.

E

But that was not the end of the matter. Despite Taylor's acquittal, the alert for his arrest remained active within CPD's system. A month later, on December 23, 2011, a CPD officer pulled over a car in which Taylor was riding. When the officer ran Taylor's name, the alert appeared, leading to Taylor once again being arrested—on the exact same charge on which he had been acquitted a month prior. The arresting officer contacted Detective Weitzman, who realized the mistake and quickly saw to it that Taylor be released. Even then, though, the alert for Taylor's arrest remained active for another month. At last, on January 31, 2012 Detective David Betz canceled the alert, bringing this mess of events to a close.

II

In 2013, Taylor invoked 42 U.S.C. § 1983 and brought this suit against the various CPD officers involved in the apartment search and his subsequent arrests and against the City of Chicago itself. He alleged numerous violations of his constitutional rights.

The district court, over the course of three separate opinions, granted summary judgment to all defendants on all counts. It suffices for now to overview Taylor's claims, as our

ensuing analysis of each claim addresses the district court's reasons for entering judgment for the defendants.

A

The first seven counts of Taylor's complaint allege constitutional violations by Officer Hughes, Detective Weitzman, and eight other CPD officers present for the search: Kevin Johnson, Russell White, Kenneth Yakes, Shawn Pickett, Richard Peck, Thomas Lieber, Scott McWilliams, and Yolanda Collier. Taylor's claims against these officers fall into three buckets: the procurement of the search warrant, the execution of the warrant, and the false arrest of Taylor on both June 28 and December 23, 2011.

*Count I* named all individual defendants (except Detective Weitzman), but it focused on Officer Hughes. Hughes, the complaint alleged, procured the search warrant through misrepresentation by recklessly relying on John Doe's unreliable testimony and by failing to inform the issuing judge that he had not corroborated Taylor's address.

*Counts II* and *III* alleged unlawful entry and search by Officer Hughes and the rest of the search team on the basis that the warrant lacked probable cause and misstated Taylor's address, violating the Fourth Amendment's particularity requirement.

*Counts IV, V,* and *VII* alleged false arrest against all individual defendants—the former two counts relating to the June 2011 arrest, the latter relating to the December rearrest. Both arrests, Taylor alleged, were unsupported by probable cause.

Finally, *Count VI* alleged supervisory liability against Sergeant Kevin Johnson, the search team supervisor, for the constitutional violations relating to the search and the June arrest.

B

That leaves *Count VIII*, Taylor's claims against the City of Chicago. Taylor alleged that two of its policies—the investigative alerts policy and the policy permitting officers to obtain search warrants in reliance on the testimony of John Doe informants—were unconstitutional. See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

First, Taylor alleged that CPD's policy permitting the use of John Doe informants in the procurement of search warrants failed to include sufficient safeguards to ensure the credibility of such anonymous tipsters. In Taylor's view, the City was deliberately indifferent to a widespread police practice of abusing this policy by using unreliable informants to secure warrants not based on probable cause.

Next, Taylor claimed that the investigative alerts policy was unconstitutional on its face and that gaps in the policy created an implicit policy permitting arrests without probable cause. Taylor alleged the City designed the policy to circumvent the Fourth Amendment's warrant requirement by permitting officers to make arrests without a judicial determination of probable cause. And even if the policy is constitutional as written, Taylor submitted, the City failed to enforce its own auditing requirement, leading inevitably to false arrests like the one in this case.

\* \* \*

With summary judgment entered against him on all claims, Taylor appealed.

### III

### A

We start where this all started—with the search warrant. Taylor says the district court erred in concluding that Officer Hughes had not procured the warrant by misrepresentation. We agree with Taylor.

False statements in warrant applications are serious business. In *Franks v. Delaware*, the Supreme Court held that a warrant is invalid if the required finding of probable cause is premised on an officer's "false statement [made] knowingly and intentionally, or with reckless disregard for the truth." 438 U.S. 154, 155 (1978). Warrants procured in violation of *Franks* are void, and their fruits suppressed in criminal proceedings. See *id.* at 156. And officers who violate *Franks* face liability for money damages under § 1983. See *Supreme Video, Inc. v. Schauz*, 15 F.3d 1435, 1441 (7th Cir. 1994) (citing *Olson v. Tyler*, 771 F.2d 277, 281 & nn.5–6 (7th Cir. 1985)). To earn a trial on such a claim, a § 1983 plaintiff must bring forth enough evidence to permit a reasonable jury to conclude that the defendant officer made intentional or reckless misrepresentations of fact that were necessary to the finding of probable cause. See *Perlman v. City of Chicago*, 801 F.2d 262, 264–65 (7th Cir. 1986).

In entering judgment against Taylor, the district court focused its analysis on whether Officer Hughes's reliance on the John Doe informant constituted reckless disregard for the truth. The district court answered no, and we see no error in that conclusion.

John Doe identified Taylor in a photo array, directed Officer Hughes to Taylor's apartment, and appeared under oath

before the Cook County judge who issued the warrant. In these circumstances, Doe's testimony sufficed to create probable cause to search under our decisions in *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1056–58 (7th Cir. 2018), and *United States v. Dismuke*, 593 F.3d 582, 587–88 (7th Cir. 2010), abrogated on other grounds, as recognized in *United States v. Miller*, 721 F.3d 435, 438–39 (7th Cir. 2013). And unlike the officer in *United States v. Glover*, Hughes did not hide from the issuing judge any known material facts adverse to Doe's credibility. 755 F.3d 811, 817 (7th Cir. 2014).

To be sure, Officer Hughes did not vet the John Doe as carefully as he could have. Time and again we have emphasized that "information about [an] informant's credibility or potential bias is crucial," *id.* at 816, and we are troubled by the eagerness with which Hughes appeared willing to accept John Doe's story as true. See *Jacobs v. City of Chicago*, 215 F.3d 758, 768 & n.4 ("[O]fficers seeking a search warrant relying on information provided by a confidential informant are under an obligation to take reasonable steps to confirm that information before using it in an affidavit in support of the warrant."). From what we can discern from the summary judgment record, Hughes does not seem to have asked Doe how he knew Robert Taylor or why he chose to come forward with information, and so did nothing to ensure that Doe's tip was not one "provided to harass or remove a rival." *Id.* (citing *United States v. Bell*, 585 F.3d 1045, 1050 (7th Cir. 2009)).

Still, while we reaffirm that officers must take care to assure themselves of the reliability of their informants, we conclude that any half-measures Officer Hughes took with respect to the John Doe here did not rise to the level of a reckless disregard for the truth.

The same cannot be said of what *else* Officer Hughes told
the issuing judge. In our review of the summary judgment
record, two aspects of Hughes's conduct jumped off the page.
First, in the warrant affidavit he submitted to the judge, Of-
ficer Hughes listed Robert Taylor's address six separate times
as "645 W. 62nd Street #1S." But neither the warrant applica-
tion nor Hughes himself made any mention of the fact that he
did nothing to corroborate this information and instead had
merely "decided that it was 645 1S."

The district court characterized this decision as "sug-
gest[ing] a lack of diligence on [Officer Hughes's] part." What
happened here is worse than that. We see the record as estab-
lishing, at a minimum, reckless misconduct by Officer
Hughes. And that misconduct resulted in a serious misstate-
ment—a misrepresentation that the apartment to search was
#1S at 645 W. 62nd Street. By Officer Hughes's own admis-
sion, that was false. Officer Hughes guessed at the apartment
number and did so because, in his view, confirming Taylor's
actual address—say, by running Taylor's name through po-
lice or city databases, looking for his name on the building's
mailboxes, or contacting the landlord—would take too long.

We are skeptical. Officer Hughes has pointed to no exi-
gency that would have prevented him from undertaking the
sort of routine policework contemplated by the Fourth
Amendment's particularity requirement. It is not too much to
ask that a police officer seeking judicial authorization to
search someone's home take steps to confirm the right ad-
dress. By its very terms, the Fourth Amendment confers a
"right of the people to be secure" not only in their "persons,"
"papers," and "effects," but also in their "houses." U.S. Const.
amend. IV. The U.S. Reports are full of cases underscoring the

sanctity of the home. See, *e.g.*, *Payton v. New York*, 445 U.S. 573, 585 (1980) ("The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.") (cleaned up). Guessing at an address to get a search warrant is intolerable, and that is unfortunately what Officer Hughes did here.

We are similarly troubled by another aspect of Officer Hughes's warrant application: its language authorizing a search for "any paraphernalia used in the weighing, cutting or mixing of illegal drugs," and "[a]ny money, any records detailing illegal drug transactions." These statements, too, were unsupported by probable cause. Hughes's affidavit was silent on the presence of drugs, and when asked if the John Doe informant told him anything about drugs at Taylor's residence, Hughes testified that "he did not." Nor did either Doe or Hughes "tell [the judge] about any drugs." The only support for a search for drugs was Officer Hughes's instinct that "drugs and guns go hand [in] hand," which again he did not mention to the issuing judge. This is nothing but "a mere hunch," which does not give rise even to reasonable suspicion, let alone probable cause. *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (cleaned up).

Under these circumstances, nothing Officer Hughes told the issuing judge could have "provide[d] [him] with a substantial basis for determining the existence of probable cause" to believe drugs would be found in Taylor's apartment. *Illinois v. Gates*, 462 U.S. 213, 239 (1983). As to this portion of the warrant, the judge's signature was "a mere ratification of [Hughes's] bare conclusions" that drugs and guns go hand in hand. *Id.* Such rubber-stamping, the Supreme Court has underscored, amounts to "an abdication of the magistrate's

duty." *Id.* The warrant should have never issued—the same conclusion the Circuit Court of Cook County reached in dismissing the gun charge against Taylor.

What is equally clear is that all of this could easily have been avoided. The stock references to drug paraphernalia should have been omitted from the warrant application. And Officer Hughes knew exactly where Taylor lived based on the John Doe's instructions. He should have included that information in the warrant affidavit. We have explained that the executing officer's personal knowledge of the place to be searched may be relevant to the question whether the warrant is sufficiently particularized, but only if that information was communicated to the issuing judge. See *United States v. Jones*, 54 F.3d 1285, 1292 (7th Cir. 1995). Instead of availing himself of this option for describing the location of Taylor's apartment, Officer Hughes chose to say nothing, and to present the judge with a warrant to seize items for which no probable cause existed from an address plucked from a hat.

That decision leads us to conclude that Officer Hughes, at the very least, made reckless misrepresentations of fact in procuring the warrant, the first element of a successful *Franks* claim. And from there the second element—that these misrepresentations were necessary to the finding of probable cause—is academic. "Probable cause exists," we have explained, when "a reasonably prudent person would believe that contraband or evidence of a crime will be found *in the place to be searched.*" *United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013) (cleaned up) (emphasis added). The building at 643–45 W. 62nd Street has four units on each floor. If the issuing judge had known that the warrant before him had only a one-in-four chance of listing the correct address, he

surely would not have signed it. At that point, Officer Hughes might have revealed the additional information Doe had given him about where Taylor lived, and perhaps the warrant would have been rewritten to encompass those more specific directions. But that did not happen.

Taking our own careful look at the summary judgment record, we are left with an unmistakable reality. Officer Hughes told the Cook County judge that he knew Taylor's address when in fact he did not. And he told the judge that there was probable cause to believe drugs would be found in the apartment when in fact there was not. These misrepresentations are at the heart of this case. We would not be here without them. And these misrepresentations constitute an open-and-shut violation of *Franks*.

The record is clear on these points, with no lingering material questions for a jury to decide. We therefore reverse the district court's grant of summary judgment for Officer Hughes on Count I and direct entry of summary judgment for Taylor. The only item left for trial is the question of damages.

B

This brings us to the search itself. Taylor argues that the district court erred by granting Officer Hughes qualified immunity on the basis that he executed the search of Taylor's apartment in good faith reliance on the warrant. Again we agree with Taylor.

An officer who executes a search in reliance on a subsequently invalidated warrant may be liable under § 1983 only if the warrant application was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley v. Briggs*, 475 U.S. 335, 345 (1986). This is "the

same standard of objective reasonableness" that defines the good-faith exception to the exclusionary rule in the criminal context. *Id.* at 344 (citing *United States v. Leon*, 468 U.S. 897 (1984)). Under this rule, an officer will be personally liable only if (1) another case clearly establishes that a similar affidavit did not give rise to probable cause or (2) "the affidavit is so plainly deficient that any reasonably well-trained officer 'would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" *United States v. Koerth*, 312 F.3d 862, 869 (7th Cir. 2002) (quoting *Malley*, 475 U.S. at 345).

The district court agreed with Taylor that, because the warrant listed an incorrect address, it was invalid for lack of particularity. This is beyond dispute: the warrant particularly described *an* apartment—just not Robert Taylor's. Put another way, no officer without Officer Hughes's outside knowledge could read the warrant and "with reasonable effort ascertain and identify the place intended," because the warrant simply did not list the actual and intended target of the search. *United States v. McMillian*, 786 F.3d 630, 639 (7th Cir. 2015). Even so, the district court determined that Officer Hughes was entitled to qualified immunity for executing the search because he "had a good faith-belief in the warrant's validity." In the district court's view, "Hughes (and the other searching officers) reasonably believed they had secured a valid warrant for Taylor's apartment, and that is where they searched."

Our holding that Officer Hughes procured the warrant through misrepresentation compels a different result. The rule in *Franks* is clearly established: an officer may not procure a search warrant by making a knowing or reckless misrepresentation of material fact. See 438 U.S. at 155. And so we have

held that "in cases in which suppression would be warranted [under *Franks*] because an officer was dishonest or reckless in preparing a warrant affidavit, that officer would not enjoy good faith immunity for civil damages." *Olson*, 771 F.2d at 282; see also, *e.g.*, *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994) ("Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, … the shield of qualified immunity is lost.") (citations omitted).

This parallelism between suppression in the criminal context and liability in the civil context makes sound sense here. An officer who procures a warrant in violation of *Franks* cannot conduct a search in good faith reliance on the validity of that warrant: inherent in a *Franks* violation is a finding that the officer knows—or at least reasonably should know—that the warrant *is not valid*. Here, Officer Hughes violated *Franks* by guessing at Taylor's address. As such, he reasonably should have known that the warrant was invalid for failure to "particularly describ[e] the place to be searched." U.S. Const. amend. IV.

Under these circumstances, it is no stretch to say that "the affidavit [was] so plainly deficient" that Officer Hughes "should not have applied for the warrant." *Koerth*, 312 F.3d at 869 (citations omitted). He is therefore not entitled to qualified immunity for the search on the basis of his good-faith reliance on the warrant. See *Malley*, 475 U.S. at 344 (observing that it would be "incongruous" to suppress evidence where reliance on a warrant is objectively unreasonable "while exempting police conduct in applying for an arrest or search warrant from any scrutiny whatsoever in a § 1983 damages action").

Officer Hughes suggests an alternative path to affirmance, relying on our decision in *Muhammad v. Pearson*, 900 F.3d 898 (7th Cir. 2018). In *Muhammad*, officers procured a valid warrant for "Apartment 1," but at the scene they found *two* apartments—1A and 1B. *Id.* at 901. We approved the officers' decision to search 1A because "the omission of 'A' from the warrant was a clerical omission" and the executing officer "used his knowledge of the case, including information from his source, to search the correct apartment." *Id.* at 906. The rule coming out of *Muhammad* is that, in some cases, "officers executing a search warrant can rely on what they know and see independent of the documents to make sure they search the correct premises, at least where the circumstances show there is no reasonable chance that the officers will search the wrong location." *Id.* at 905.

Officer Hughes contends that *Muhammad* controls here. His position is straightforward: while the warrant signed by the Cook County judge listed the wrong address for Robert Taylor, Hughes used the information provided by John Doe to lead the search team to the correct apartment within the larger complex. The district court saw this fact as militating in favor of immunity: "Hughes mitigated the risk that the wrong location would be searched by participating in the search and directing the team to the correct location." Hughes goes one step further, arguing that, under *Muhammad*, his reliance on John Doe's directions to reach Taylor's apartment rendered the search reasonable and precludes liability.

Not so in our view. In *Muhammad*, the officer had corroborated many times over that 1A was the correct unit, and the officers had some of those confirmatory materials with them when they executed the search. *Id.* at 902–03. There was no

question in *Muhammad* that the officers acted in good faith—the case is really just about a typo. To our eye, this good-faith context is crucial to a proper understanding of *Muhammad*. The bottom line there was *not* that the search was reasonable, but only that the executing officer acted in good faith and was entitled to qualified immunity: no case clearly established that he "could not proceed to search the apartment that he knew, beyond reasonable dispute, was the intended target." *Id.* at 907. In *Muhammad*, both the affiant officer and the issuing judge intended the same target: Apartment 1A. See *id.* at 904. And so we granted qualified immunity because there was "no reasonable chance that the officers [would] search the wrong location, *meaning a location other than the one the issuing magistrate authorized*." *Id.* at 905 (emphasis added).

This case is far different. Officer Hughes and the issuing judge may both have *said* the search's target was #1S at 645 W. 62nd Street, but they *meant* different things by it. For Hughes, the number was just a placeholder: he wanted to search Taylor's apartment, whatever number it ended up being. But the Cook County judge approved a search only of #1S at 645 W. 62nd Street. What was present in *Muhammad*, then, was missing here—"no reasonable chance that the officers [would] search … a location other than the one the issuing magistrate authorized." *Id.* at 905. In fact, because there were four units on the floor and because the search team was following Hughes's instructions, there was a 75% chance the officers would search the "wrong" location from the judge's perspective—any unit other than 645 #1S.

That Officer Hughes was present to lead the search team to the correct apartment does not change the analysis. Hughes is entitled to good-faith immunity only if he could have

"reasonably believed that the search [he] conducted was authorized by *a valid warrant*." *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984) (emphasis added). He could not have done so. We therefore reverse the grant of summary judgment for Officer Hughes on Counts II and III, enter summary judgment for Taylor, and remand for a determination of damages.

C

Onto the first of Taylor's two false arrest claims. The district court determined that the officers had probable cause to believe that Taylor possessed both the black .38 revolver identified by the John Doe informant and the blue pistol found in the apartment's second bedroom. In the alternative, the district court found that the officers were entitled to qualified immunity on the basis that there was arguable probable cause to arrest Taylor. We agree with the alternative conclusion and affirm on that basis alone.

Start with the black .38 revolver. By the district court's reasoning, because of the nature of the felon-in-possession crime, the "same probable cause to believe Taylor possessed evidence of a crime was probable cause to believe Taylor committed" the crime itself. Since probable cause to arrest on any basis precludes a false arrest claim, see *Holmes v. Vill. of Hoffman Ests.*, 511 F.3d 673, 682 (7th Cir. 2007), the district court concluded that Taylor's claim must fail on this basis.

This reasoning may have supported an arrest *before* the search. But we do not need to resolve that question. The fact remains that Taylor was not arrested until after the officers had searched his apartment. Probable cause to search was based on John Doe's testimony that Taylor had a black .38 caliber pistol in that apartment. But remember that the search

turned up no such gun, so on this point John Doe's information did not pan out and could not supply probable cause to arrest. See *United States v. Haldorson*, 941 F.3d 284, 292 (7th Cir. 2019) ("There could be circumstances in which the subsequent investigation turns up new facts or evidence that disprove or discredit the original information.").

The harder question involves the blue gun found during the search—the gun the officers actually relied upon in arresting and then charging Taylor with possession. Officers found the blue gun in an open safe in the apartment's second bedroom, alongside Mario Barnes, Barbara Taylor, and Barnes's three children. The district court determined that there was probable cause to believe that Taylor had "constructive possession" of this weapon as the term is defined under Illinois law, and that in any event the question of probable cause was at least arguable, entitling the officers to qualified immunity.

Constructive possession in Illinois requires "(1) that defendant had knowledge of the presence of the weapon; and (2) that defendant exercised immediate and exclusive control over the area when the weapon was found." *People v. Ross*, 947 N.E.2d 776, 781 (Ill. App. Ct. 2011). Illinois courts have given these elements broad definition, with some cases indicating that mere "[h]abitation in or rental of the premises where [contraband is] discovered is sufficient evidence of control to constitute constructive possession," *People v. Cunningham*, 723 N.E.2d 778, 782 (Ill. Ct. App. 1999), and underscoring that the "fact that others had access to the premises does not defeat constructive possession." *People v. Hill*, 977 N.E.2d 166, 180 (Ill. Ct. App. 2012).

We are not confident that the facts before us—proof that Taylor resided in one room with a blue gun found in another

room—sufficed to create probable cause. We could locate no Illinois case finding constructive possession where, as here, the defendant was not present during the seizure and there was no evidence linking the defendant to the location in which contraband was found—here, the second bedroom. See, *e.g.*, *Cunningham*, 723 N.E.2d at 781–82 (finding constructive possession where the defendant was not present but drugs were found in a locked room accessible with a key taken from the defendant); *People v. Givens*, 934 N.E.2d 470, 485 (Ill. 2010) (finding constructive possession where cocaine was discovered on a nightstand next to the bed in which defendant was asleep with her fiancé); *People v. Ross*, 947 N.E.2d 776, 781 (Ill. Ct. App. 2011) (finding constructive possession where "only defendant was in possession of the vehicle when the handgun was found").

Indeed, some Illinois cases seem to indicate that probable cause would likely *not* exist on these facts. See *People v. Alicea*, 999 N.E.2d 392, 394, 398–99 (Ill. Ct. App. 2013) (finding no constructive possession where weapons were found in a room with one piece of recent mail addressed to the defendant, and the only person present during the search was the defendant's adult son); *People v. Maldonado*, 35 N.E.3d 1218, 1223–26 (Ill. Ct. App. 2015) (relying on *Alicea* to find no constructive possession based on the presence of mail addressed to the defendant when the defendant was not present during the search); *People v. Kissinger*, 325 N.E.2d 28, 29–31 (Ill. Ct. App. 1975) (finding constructive possession only as to drugs found in common areas of a multi-person residence, and not as to drugs discovered in the yard or in an upstairs bedroom occupied by another adult).

These latter cases, however, each confronted the question whether constructive possession had been proven beyond a reasonable doubt. But probable cause is a lower bar. Regardless, the second set of cases casts doubt on the district court's affirmative finding that the officers here had probable cause to arrest Robert Taylor for possessing the blue gun found in the second bedroom, the room where Mario Barnes was present. So too, it must be said, does Officer Hughes's own deposition testimony. When asked why he did not arrest Barnes, himself a felon, for possessing the blue gun, Hughes testified that he "never saw him in possession of a weapon." It is unclear how Officer Hughes could have believed that Taylor constructively possessed the blue gun but that Barnes did not. And Hughes's explanation does not help things. Asked why he believed the blue gun was Taylor's, Hughes responded only that Taylor "was known to carry weapons" and that "the reason why I was there [was] for a search warrant for a gun." We find these statements—each of which again reflect indifference to the demands of the Fourth Amendment on Officer Hughes's part—alarming.

In the end, though, the district court was right to approach the probable cause inquiry in strictly objective terms. And as an objective matter, weighing the scant evidence in this case against the unsettled caselaw, we are not comfortable deciding whether probable cause existed under Illinois law to arrest Robert Taylor for possessing the blue weapon. See *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Instead, we resolve this question on narrower grounds. An officer who makes an arrest is entitled to qualified immunity if "a reasonable officer could have believed [the] arrest to be lawful, in light of clearly established law and the

information the arresting officers possessed." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (cleaned up); see also *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). Given the broad language employed by some Illinois cases and the lack of a contrary case directly on point, we conclude that qualified immunity precludes liability for Officer Hughes and Detective Weitzman on Taylor's first false arrest claim.

We affirm the district court's entry of summary judgment on Counts IV and V.

## D

Taylor's second false arrest claim stems from the December 2011 arrest. Recall that Taylor was acquitted of his felon-in-possession charge a month earlier, in November 2011. This means there can be no question this second arrest was unconstitutional—there was no probable cause to arrest Taylor a second time.

The district court entered summary judgment for Officer Hughes and the rest of the executing officers on the basis that they were not personally involved in the December arrest. But with respect to Detective Weitzman, who opened the investigative alert in the first place, the district court found a question of fact as to whether he was responsible for canceling the alert, and thus potentially liable for failing to do so. But even assuming Weitzman shouldered responsibility for canceling the alert, the district court determined he was entitled to qualified immunity because there existed no case that would have put him on notice that his "failure to cancel the investigative alert … violated a clearly established constitutional right not [to] be seized on a stale alert."

In his opening brief, Taylor does not explain why the district court was wrong to conclude that no clearly established right had been violated, instead pressing only two arguments that the district court rejected along the way to its ultimate conclusion. Taylor has thus waived any challenge to this ruling on appeal. See *Tuduj v. Newbold*, 958 F.3d 576, 579 (7th Cir. 2020) ("[A]rguments not raised in an opening brief are waived.").

In any event, even assuming Detective Weitzman bore some responsibility for canceling the alert, nothing in the record indicates that he recklessly or intentionally left open the stale alert for Taylor's arrest—conduct akin to a *Franks* violation. See *Herring v. United States*, 555 U.S. 135, 146 (2009) ("If the police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests, exclusion would certainly be justified."). Absent such misconduct, Weitzman could be liable only if an existing case clearly established that his failure to monitor and cancel Taylor's alert violated Taylor's constitutional rights. Like the district court, we too have not found such a case.

We affirm the entry of summary judgment for Detective Weitzman on Count VII.

E

To this point we have focused our analysis on Officer Hughes and Detective Weitzman, aligning with the emphasis placed on these two defendants in both parties' briefing. But Taylor has appealed as to all the named individual defendants, so we pause briefly to address the claims against the remaining eight officers.

As to these officers, we affirm the district court across the board. On Count I, there is no evidence that any officer except Hughes was involved in procuring the warrant. See *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (explaining that, in § 1983 cases, "each Government official … is only liable for his or her own misconduct"). On Counts II and III, all officers except Hughes acted in good faith reliance on the facially valid search warrant. *Malley*, 475 U.S. at 345. Taylor makes no argument on appeal as to Count VI, for supervisory liability against Sergeant Kevin Johnson, so that claim is waived, see *Tuduj*, 958 F.3d at 579, and in any event there is no indication that Johnson was "personally involved in [Hughes's] constitutional violation[s]." *Taylor v. Ways*, 999 F.3d 478, 493–94 (7th Cir. 2021). And on Counts IV, V, and VII, we see no evidence that any officer besides Hughes and Weitzman played a role in either of Taylor's two arrests. See *Iqbal*, 556 U.S. at 677.

F

Finally, Taylor seeks to hold the City of Chicago liable for two of its policies under the doctrine of *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Liability under *Monell* is difficult to establish, requiring a § 1983 plaintiff to prove that a municipality, either through an express policy or an implied policy of inaction, took "deliberate" action that was the "moving force" behind a constitutional injury. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403–07 (1997).

We can make quick work of Taylor's first *Monell* claim—that CPD's policy of permitting officers to procure warrants through the use of John Doe informants is unconstitutional. Without detracting from our earlier skepticism of Officer Hughes's hasty reliance on the John Doe in this particular

case, that reliance caused Taylor no constitutional injury. And so there can be no *Monell* liability. *Id.* at 403. We affirm the district court's entry of summary judgment for the City on this theory of liability.

The challenge to CPD's investigative alerts policy requires more analysis. Taylor undoubtedly suffered a constitutional injury when, based on the stale alert, he was arrested in December 2011 without probable cause. The question is whether the City itself can be held liable for that Fourth Amendment violation.

*Monell* liability may attach in two limited sets of circumstances. First, if an express municipal policy or "affirmative municipal action is itself unconstitutional," a *Monell* plaintiff has a "straightforward" path to holding the municipality accountable. *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc) (citing *Bryan County*, 520 U.S. at 404–05). In such cases, a single instance of a constitutional violation caused by the policy suffices to establish municipal liability. *Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985); see also *Calhoun v. Ramsey*, 408 F.3d 375, 379–80 (7th Cir. 2005).

The second path to *Monell* liability runs not through an expressly unconstitutional policy, but instead through "gaps in express policies" or through "widespread practices that are not tethered to a particular written policy"—situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid. *Calhoun*, 408 F.3d at 380. Plaintiffs seeking to impose municipal liability on a theory of municipal inaction must typically point to evidence of "a prior pattern of similar constitutional violations." *Polk County*, 960 F.3d at 380. This heightened evidentiary burden helps ensure that "there is a true municipal

policy at issue, not a random event," *Calhoun*, 408 F.3d at 380, to comport with *Monell*'s holding that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

To be sure, there exists a narrow exception to the requirement of evidence of prior violations for the "rare" case in which "the unconstitutional consequences" of municipal inaction are "so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 64 (2011). Such cases are ones where "a violation of federal rights [is] a highly predictable consequence" of a municipality's failure to act. *Bryan County*, 520 U.S. at 409; see also *Polk County*, 960 F.3d at 382; *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017) (en banc); *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004).

Taylor invokes both theories of *Monell* liability. He argues first that CPD's investigative alerts system is facially unconstitutional because, in his view, it permits warrantless arrests without probable cause. Taylor further contends that there is a widespread custom of shoddy audits resulting in arrests based on stale alerts. We find neither argument persuasive.

The first claim falls well short. Taylor is correct that CPD's investigative alert policy is not a model of clarity, but nothing in the express terms of the policy allows officers to arrest individuals without probable cause.

The policy creates two types of alerts: "Investigative Alert / Probable Cause to Arrest" and "Investigative Alert / No Probable Cause to Arrest." And it expressly states that "AN ARREST IS NOT AUTHORIZED" on the basis of

the second type of alert, but only the first. The policy goes on to require an officer creating an alert to specify a "[j]ustification for the investigative alert request." Presumably, although this is not stated expressly, the "justification" for an "Investigative Alert / Probable Cause to Arrest" must include the basis for the determination that there was probable cause to arrest. And, indeed, the investigative alert entered in Taylor's case listed his offense as "WEAPONS VIOLATION UNLAWFUL POSS OF HANDGUN." The policy further provides for regular audits "to ensure investigative alert requests on file are canceled when the subject of the alert has been apprehended or the investigative alert is no longer needed."

The Fourth Amendment permits warrantless arrests supported by probable cause. See *United States v. Watson*, 423 U.S. 411, 416–24 (1976). And one officer's determination of probable cause may be imputed to other officers in the department, who may arrest on the basis of the first officer's finding. See *United States v. Hensley*, 469 U.S. 221, 232–33 (1985). On its face, then, the investigative alerts system does not offend the Fourth Amendment. The City's policy authorizes arrests based upon probable cause, and it provides a mechanism by which stale alerts are to be canceled.

But this mechanism does not appear to have worked as planned, at least at the time of Taylor's arrest—which brings us to Taylor's second theory of *Monell* liability. CPD amended its policy on investigative alerts (formerly called "stop orders") at least twice in the years prior to 2011, so that the alerts initially expired automatically after seven days, then after six months, and then (in the current system) *never* unless they are manually deleted. That is where the audits come in—to ensure that stale alerts get purged from the system at

regular intervals. But the policy does not specify any particular procedure for conducting these audits, and as the district court found, in 2011 "there were thousands of [open] investigative alerts, yet no record of any audits or a paper trail of accountability."

The ineffectiveness of these audits resulted in Taylor's constitutional injury. Under the terms of the policy, the alert for his arrest should have been canceled in June 2011 when he turned himself in at the police precinct, or at the very least upon his acquittal in November 2011. But it was not, so Taylor was arrested on the same alert in December. And inexplicably, the alert yet again remained active for more than a month after this second arrest, until an officer finally canceled it in January.

Taylor says this series of events displays deliberate indifference to an implied policy of inaction on the part of the City of Chicago. But under *Monell*, an implied policy is typically actionable only with "considerably more proof than [a] single incident." *Tuttle*, 471 U.S. at 824. And here Taylor can point to only one constitutional violation—his December 2011 arrest. If CPD were engaged in a widespread practice of false arrests based on stale investigative alerts, we would have expected discovery in this case to turn up some evidence to that effect—internal documents, citizen complaints or calls for an investigation, or perhaps some form of inquiry by an inspector general. But Taylor has not come forward with anything along these lines. We are therefore not assured that this arrest was the product of "a true municipal policy" rather than "a random event"—and a very unfortunate one at that. *Calhoun*, 408 F.3d at 380. Put another way, we cannot say here that the municipality's failure to implement more concrete auditing

procedures was "the 'moving force' behind the injury alleged." *Bryan County*, 520 U.S. at 404.

Nor is this case one where a false arrest like Taylor's is a "highly predictable consequence" of a gap in a municipal policy, permitting *Monell* liability on the basis of a single violation. *Id.* at 409. The policy as written requires "the unit investigative alert file [to be] audited each police period"—roughly every month—to ensure the cancelation of stale alerts. If the policy had been followed as written, Taylor's second arrest would have never happened. Given this express auditing requirement, the likely occurrence of false arrests based on stale alerts was not "so patently obvious" that the City's failure to provide more direction can be called deliberate indifference. *Connick*, 563 U.S. at 64. We therefore affirm the district court's entry of summary judgment for the City of Chicago on Taylor's *Monell* claims relating to the investigative alerts policy.

**IV**

What happened to Robert Taylor in the second half of 2011 should be a cautionary tale for the Chicago Police Department. The events reflect a combination of administrative corner-cutting and out-and-out misconduct by a member of the force. In the end, Robert Taylor spent 128 days in jail before being cleared of his charges, only to be arrested again for no reason. All of this could have been avoided had the officers in this case—and Officer Hughes in particular—acted with more deliberation and care. The Fourth Amendment demands nothing less.

For these reasons, we AFFIRM in part, REVERSE in part, and REMAND.

HAMILTON, *Circuit Judge*, concurring in part and dissenting in part. I join almost all of Judge Scudder's careful and persuasive opinion. It provides important and pointed guidance on police officers' duty of candor in seeking search warrants. With regret, however, I cannot join one portion of Part III–F. That portion addresses plaintiff's *Monell* claims against the City of Chicago based on the "investigative alert" system used by the police department. I agree with much of what is said about the law of *Monell* in Part III–F, but I respectfully dissent from the application of that law to plaintiff's evidence on one theory. I would reverse summary judgment on plaintiff's claim that his second arrest, in December 2011, was caused by a widespread and unconstitutional city practice of failing to carry out the promised "audits" to remove stale investigative alerts. Plaintiff has come forward with evidence sufficient to take that claim to trial.

Under the investigative alert system, Chicago police maintain a database of such "alerts," both with and without probable cause, based on information received from officers. Under the policy, an officer who encounters a person subject to an alert labeled "Probable Cause to Arrest" is authorized to arrest that person pending further investigation. In other words, an investigative alert with probable cause is the practical equivalent of an arrest warrant.[1]

---

[1] One might reasonably wonder why, under the Fourth Amendment, such arrests of human beings are authorized without a judge finding probable cause and issuing a warrant, while a non-exigent search of a home ordinarily requires a search warrant issued by a judge. That's a question asked by the concurring and dissenting Justices in *United States v. Watson*, 423 U.S. 411 (1976), where the Court drew that distinction between arrests

But how reliable or stale is the information in the database? According to the written policy, "the unit investigative alert file is [to be] audited each police period." The policy does not specify who is supposed to carry out such audits or how, or how thoroughly. And here is how the district court summarized the evidence about real-life, as opposed to paper, auditing:

> In 2011, at the time of Taylor's arrest, thousands of investigative alerts were inputted into the system. *The parties dispute whether any audits took place that year, but there were no records of any audit completed in 2011*, no written criteria for performing audits, and no records demonstrating lieutenants were held accountable for conducting audits. (Emphasis added.)

Part III–F of the court's opinion correctly finds that the audit provision of the investigative alert policy is essential for the *written* policy to withstand constitutional challenge. Ante at [29] ("The City's policy authorizes arrests based upon probable cause, and it provides a mechanism by which stale alerts are to be canceled."). The court's opinion also acknowledges that the audit mechanism imagined by the written policy did not work as planned in plaintiff's case. He was arrested on the alert for a second time in December 2011, six months after his original arrest on the same alert and more than a month after he had actually been acquitted on the charge for which that alert had been issued.

---

and searches. On this topic, for those of us in the lower federal courts, "a page of history is worth a volume of logic." See *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921) (Holmes, J.).

The court's opinion affirms summary judgment for the city on the failure-to-audit *Monell* claim because plaintiff has not come forward with evidence of similar, prior unjustified arrests caused by the city's systemic failure to audit pending investigative alerts. Ante at 30–31. Such evidence should not be needed here. As the court's opinion acknowledges, evidence of other similar constitutional violations is not required under *Monell* for a practice or custom claim where "'a violation of federal rights [is] a highly predictable consequence' of a municipality's failure to act." Ante at 28, quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997). The Supreme Court illustrated the point in *City of Canton v. Harris*, 489 U.S. 378 (1989). A city arms its police officers, and policymakers "know to a moral certainty" that officers will be required to arrest fleeing felons. The need to train officers on constitutional limits on use of deadly force is "so obvious" that failure to do so could amount to deliberate indifference to constitutional rights. *Id.* at 390 & n.10.

The danger that stale investigative alerts will produce constitutional violations (and waste police officers' time) is clear enough that the written policy says that monthly audits are required. That danger is also obvious enough that the audit feature is essential to our conclusion that the written policy is constitutional on its face. Yet *Monell* addresses not just written policies but also actual practices. On this summary judgment record, we must assume that the entire Chicago Police Department carried out *zero* audits of pending investigative alerts in 2011—that it did exactly nothing the entire year of 2011 to carry out a feature of the written policy that's essential to keep the practice within constitutional bounds. From that evidence, a reasonable jury could infer (a) that a total failure on that scale over that length of time reflected a de facto policy

of at least deliberate indifference to (b) an obvious danger of unconstitutional deprivations of liberty based on stale alerts.

The court's requirement of evidence of more unconstitutional incidents to prove *Monell* liability in this case of obvious dangers provides another data point in our court's conflicting jurisprudence in this important corner of § 1983 law. In a series of cases, we have applied the obvious-danger reasoning of *City of Canton* and *Bryan County* to affirm or allow *Monell* liability without proof of similar prior violations. See *J.K.J. v. Polk County*, 960 F.3d 367, 382–84 (7th Cir. 2020) (en banc) (affirming *Monell* verdict for plaintiffs; risk that male guards would sexually assault female inmates was so obvious that policymakers' failures amounted to deliberate indifference); *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 382 (7th Cir. 2017) (en banc) (reversing summary judgment on *Monell* claim; dangers faced by chronically ill inmates were so obvious that failure to adopt protocols for coordinated, comprehensive care could be deemed deliberate indifference without evidence of similar prior cases); *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (affirming verdict for plaintiff under *Monell*; danger of inmate suicide was so obvious that failure to provide adequate suicide prevention training to jail staff amounted to practice of deliberate indifference without evidence of prior suicides).

Compare those decisions, however, to the court's treatment of the issue here, insisting on other similar cases despite the obvious risks posed by systemic failures to audit investigative alerts, and to *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 237 (7th Cir. 2021) (reversing *Monell* verdict for plaintiff; plaintiff failed to show similar prior cases where prison health-care provider's policy of "collegial review"

before outside medical referrals caused similar unconstitutional delays in critical health care), and *Hildreth v. Butler*, 960 F.3d 420, 426–30 (7th Cir. 2020) (affirming summary judgment on *Monell* claim for prison health-care provider whose policies for refilling and renewing prescriptions led to predictable delays and harm because plaintiff did not offer evidence of enough incidents to establish "widespread" practice). It's worth noting that all of the obvious-danger cases just cited, other than *Woodward*, divided this court.

Perhaps the city could convince a jury, as it has convinced my colleagues, that the failure to carry out audits was not as complete as plaintiff's evidence shows or was the result of nothing worse than negligence. But with respect, the dangers of unjustified arrest here are so obvious and the failure so complete, at least according to plaintiff's evidence, that a reasonable jury could find deliberate indifference at the policy-making level of the Chicago police.

In response to these views, one might fairly ask why, if the dangers of unjustified arrests are so obvious, plaintiff cannot come forward with at least a few other examples? I expect that such examples would be quite difficult to find. Chicago must have a mountain of arrest records that did not lead to convictions. (In 2019, CPD made more than 90,000 arrests. Chicago Police Dep't, 2020 Annual Report at 50.) We have no indication that the Chicago police themselves keep track of errors resulting from stale or erroneous information in the investigative alert database. More generally, the city itself has recognized that CPD's recordkeeping practices related to litigation and constitutional compliance are not reliable. See City of Chicago Office of Inspector General, Follow-Up: Review of the    Chicago    Police    Department's    Management    and

Production of Records at 2 (Sept. 16, 2021) ("CPD's ability to meaningfully ensure that it is fulfilling all of its constitutional and legal obligations to produce all relevant records for criminal and civil litigation remains seriously impaired."). I have trouble imagining a discovery tool or an independent investigative measure that would be likely to work in this case, at least without prohibitive expense. But for now, suffice it to say that the debacle in this case and the evidence of no regular auditing put the Chicago policymakers on notice of the need for action. In *Woodward*, we said that the defendant there did not "get a 'one free suicide' pass." 368 F.3d at 929. In this case, Chicago has received a "one free bad arrest" pass for its practice of failing to audit stale investigative alerts. It should not count on receiving any more.